UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS

UNITED STATES OF AMERICA    )
                            )     No.  4:17CR00145 BSM
vs.                            )
                            )
EDGAR K. RIDDICK         )

**UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE OBTAINED FROM WARRANTLESS SEIZURE FROM CHATSTEP, DEFENDANT'S MOTION TO SUPPRESS EVIDENCE FROM CHATSTEP THAT EXCEEDED SCOPE OF THE WARRANT, AND DEFENDANT'S MOTION TO SUPPRESS EVIDENCE FROM SEARCH OF RESIDENCE AND REQUEST FOR VOLUNTARINESS HEARING**

The United States Attorney for the Eastern District of Arkansas, Cody Hiland, by and through Kristin Bryant, Assistant United States Attorney, for its Response to Defendant's Motion to Suppress Evidence Obtained From Warrantless Seizure from ChatStep (Doc. No. 23), Defendant's Motion to Suppress Evidence From ChatStep that Exceeded Scope of the Warrant (Doc. No. 24) and Defendant's Motion to Suppress Evidence From Search of Residence and Request for Voluntariness Hearing  (Doc. No. 26), respectfully states:

## I.    STATEMENT OF FACTS

On May 30, 2016, Chatstep, an online chatroom conferencing platform, reported to the National Center for Missing and Exploited Children ("NCMEC") CyberTipline a possible incident of child pornography in CyberTipline Report #11995093. The report included the image, and information about the account that uploaded the image, giving the screenname: Missy, the Room: Nuderoom and the user's IP address: 71.238.241.25. (Ex. 1, ¶ 1).

CyberTipline Report #11995093 was forwarded to the Little Rock Police Department where a detective viewed the image and concluded it met the definition of child pornography.

1

The image depicted a color image of a prepubescent female laying on her back holding herself up on her elbows, her legs spread exposing her vaginal area.  (Ex. 1, ¶ 2).

On August 18, 2016, LRPD Det. Jennifer Hurd served a subpoena duces tecum on Chatstep.com for:

> Any and all records regarding the identification of the individual using the IP address 71.238.241.25 05-30-2016 04:17:54 UTC to include port number, name, address, date account created, account status, email address, alternate email address, registration from IP, date IP address registered, log in IP addresses associated with session times and dates, detailed billing logs, date account opened and closed, method of payment and detailed billing records (log on & log off times).

(Ex. 2).  ChatStep responded with information revealing the dates, times, usernames, and the room names entered into by the IP address 71.238.241.25 from March 30, 2015 to August 18, 2016.  (Ex. 2).[1]

Chatstep made another report to NCMEC CyberTipline on December 23, 2016. CyberTipline Report #16120480 indicated an account using the screenname Mom45 entered the Room: Nude, Port: 49823 using the IP address 2601:381:8105:1e30:864:e60c:13ed:ea05 and uploaded suspected child pornography that day at 6:55:40 UTC.  (Ex. 1, ¶ 3).

The image was forwarded to the Little Rock Police Department where Det. Kalmer reviewed it and determined it met the statutory definition of child pornography. The image was described as depicting a four prepubescent females nude and exposing their breasts and vaginal areas.  (Ex. 1, ¶ 4).

---

[1] When the defendant filed his Motion to Suppress Evidence obtained from Warrantless Seizure from ChatStep, the United States had not produced this subpoena or the results in discovery because the United States did not have a copy.  The subpoena and results provided by ChatStep have been provided to defense counsel. Defense counsel did not inquire about the process used to obtain the records prior to filing the motions.

On February 14, 2017, Det. Kalmer sent a search warrant to ChatStep for

> Any and all information data and/or content associated with the personal cloud storage user account connected to the Chatstep account for screen/user name: Mom45 Room: Nude Port:49823 and IP address 2601.381.8105.1e30:864:e60c:13ed:ea05, and any remote storage location connected to the above account, to include the following (if known and if available) . . . 5. IP addresses associated with account access, to include the most recent IP address recorded for the last account access and IP addresses recorded for data content uploads." (Ex. 3).

ChatStep then provided four instances that IP address 2601.381.8105.1e30:864:e60c:13ed:ea05 entered rooms in Chatstep.  (Ex. 3 & Ex. 1, ¶ 9).

On January 2, 2017, Chatstep again made a report to NCMEC in CyberTipline Report #16275741. The report was later forwarded to the Little Rock Police Department and was viewed by Detective Kalmer. The report indicated that a Chatstep account with the screenname: ccc entered Room: office, Port: 50094 using IP address: 2601:381:8105:1e30:8438:8cd8:e193:5499 and uploaded an image of child pornography.  (Ex. 1, ¶ 5).

After Detective Kalmer reviewed the image, she determined it met the statutory definition of child pornography.  The image is described as a prepubescent female and one young female nude and on a bed.  The prepubescent female is laying on her back with her legs spread. The young female is leaning toward the vaginal area of the prepubescent female with her mouth. An adult male arm and hand is in the picture holding back the hair of the young female.  The focus being on the prepubescent female's vaginal area.  (Ex. 1, ¶ 6).

On February 15, 2017, LRPD Det. Kalmer served a subpoena duces tecum on Chatstep.com for:

> Any and all records regarding the identification of the individual using the IP address 2601:381:8105:1e30:8438:8cd8:e193:5499 01-02-2017 19:53:37 UTC to include port number, name, address, date account created, account status, email address, alternate email address, registration from IP, date IP address registered, log in IP addresses associated with session times and dates, detailed billing logs, date account opened and closed, method of payment and detailed billing records (log on & log off times).

(Ex. 4).[2] ChatStep responded by providing nine instances that IP address

2601:381:8105:1e30:8438:8cd8:e193:5499 entered rooms in Chatstep from November 4, 2016 to

February 20, 2017.  (Ex. 4).

NCMEC received another report to their CyberTipline on January 4, 2017. This report

was labeled as CyberTipline Report # 16304119 and indicated that a Chatstep account using the

screenname: Missy entered Room: momsonx, Port: 51420 using IP address:

2601:381:8105:1e30:459f:6048:76e:d5f8 and uploaded one image of suspected child

pornography at 14:58:58 UTC.  (Ex. 1, ¶ 7).

CyberTipline Report # 16304119 was later forwarded to the Little Rock Police

Department Vice Detail on February 16, 2017. Detective Kalmer reviewed it that day and

determined it met the statutory definition of child pornography. The image depicted an adult

female and a prepubescent male sitting nude on a bed.  The prepubescent male is sitting in the

lap of the adult female.  The adult female is touching the prepubescent male's penis with her

hand, in a manner to masturbate him.  (Ex. 1, ¶ 8).

---

[2] When the defendant filed his Motion to Suppress Evidence obtained from Warrantless Seizure from ChatStep, the United States had not produced this subpoena or the results in discovery because the United States did not have a copy.  The subpoena and results provided by ChatStep have been provided to defense counsel.

On February 16, 2017, LRPD Det. Kalmer served a subpoena duces tecum on

Chatstep.com for:

> Any and all records regarding the identification of the individual using the IP address 2601.381.8105.1e30:459f:6048:76e:5f8 01-04-2017 14:58:58 UTC to include name, address, date account created, account status, email address, alternate email address, registration from IP, date IP address registered, log in IP addresses associated with session times and dates, detailed billing logs, date account opened and closed, method of payment and detailed billing records (log on & log off times).

(Ex. 5).[3]  ChatStep responded by providing seven pages of instances that IP address

2601.381.8105.1e30:459f:6048:76e:5f8 entered rooms in Chatstep from November 4, 2016 to

February 20, 2017.  (Ex. 5).

Detective Kalmer found, contained within the material obtained from Chatstep, that the

following IP address: 2601:381:8105:1e30:8438:8cd8:e193:5499 associated with Cybertip

#16275741 entered a room within Chatstep named '*pedos,*' as well as other sexual related chat

rooms.  (Ex. 1, ¶ 11 & Ex. 4).

Detective Kalmer found, contained within the material obtained from Chatstep, that the

following IP address: 2601:381:8105:1e30:459f:6048:76e:d5f8 associated with Cybertip

#16304119 entered a room within Chatstep named '*drobox/pedo*' and '*1cnccnessst*', as well as

other sexual related chat rooms.  (Ex. 1, ¶ 12 & Ex. 5).

Detective Kalmer found, contained within the material obtained from Chatstep that the

following IP address: 71.238.241.25 associated with Cybertip #11995093 entered a room within

---

[3] When the defendant filed his Motion to Suppress Evidence obtained from Warrantless Seizure from ChatStep, the United States had not produced this subpoena or the results in discovery because the United States did not have a copy.  The subpoena and results provided by ChatStep have been provided to defense counsel.

Chatstep named 'daddau', '*momsonlove*', '*momboylove*', and '*icnest*' as well as other sexual related chat rooms.  (Ex. 1, ¶ 13 & Ex. 2).

On August 17, 2016, a Duces Tecum Subpoena was sent to Comcast for subscriber information on IP address 71.238.241.25, used on 05-30-2016, at 04:17:54 UTC, which resulted in the following information:

> Subscriber Name: Edgar Riddick
>
> Address: 7 Greenbrier Road, Little Rock, AR 72202
>
> Phone Number: 501-912-3101
>
> Account Number: 8396600011225192

(Ex. 1, ¶ 14).

On February 8, 2017, a Court Order was sent to Comcast for subscriber information on the IP address 2601:381:8105:1e30:864:e60c:13ed:ea05, used on 12-23-2016, at 06:55:40 UTC, which resulted in the following information:

> Subscriber Name: Edgar Riddick
>
> Address: 7 Greenbrier Road, Little Rock, AR 72202
>
> Phone Number: 501-912-3101
>
> Account Number: 8396600011225192

(Ex. 1, ¶ 15).

On February 15, 2017, a Court Order was sent to Comcast for subscriber information on the IP address 2601:381:8105:1e30:8438:8cd8:e193:5499, used on 01-02-2017, at 19:53:37 UTC, which resulted in the following information:

> Subscriber Name:  Edgar Riddick

Address: 7 Greenbrier Road, Little Rock, AR 72202

Phone Number: 501-912-3101

Account Number: 8396600011225192

(Ex. 1, ¶ 16).

On February 16, 2017, a Court Order was sent to Comcast for subscriber information on the IP address  2601:381:8105:1e30:459f:6048:76e:d5f8, used on 01-04-2017, at 14:58:58 UTC, which resulted in the following information:

Subscriber Name:  Edgar Riddick

Address: 7 Greenbrier Road, Little Rock, AR 72202

Phone Number: 501-912-3101

(Ex. 1, ¶ 17).

On February 22, 2017, LRPD Detective Amber Kalmer (Det. Kalmer) applied for, and obtained a state search warrant for the residence located at 7 Greenbrier Road, Little Rock, Arkansas 72202.  (Ex. 1).  The search warrant sought evidence related to distribution, possession, or viewing matter depicting sexually explicit conduct of a child in violation of Arkansas Code Annotated 5-27-602.

In her affidavit, Det. Kalmer explained in great detail the traits and characteristics applicable to individuals who collect child pornography.  Specifically, these individuals prefer to store depictions of child pornography on computers, removable storage devices, or other hardware or media that can store visual depictions in digital form.  These types of devices have large storage capacities and allow individuals to store child pornography for years at little or not cost, without the need to delete files.  Furthermore, individuals who collect child pornography rarely destroy the

materials.  Moreover, even if an individual deleted images or files, it is possible such files or parts of the files can still be retrieved from the computer.  Also, individuals who collect child pornography often maintain names, addresses (including email addresses), phone numbers, or lists of persons who have advertised or otherwise made known on the internet that they have similar deviant interests.  (Ex. 1, ¶ 23).

Det. Kalmer also established that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the internet.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  In fact, they may reside in free space or slack space.  Furthermore, computers' internal hard drives contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  (Ex. 1, ¶ 26).

Detective Kalmer explained technicians need to be able to thoroughly examine every digital storage medium in the residence to find traces of hidden documents or correspondence that might indicate the who, what, where, when, why, and how as well as the instrumentalities and fruit of the crime for possession, distribution or viewing of child pornography.  (Ex. 1, ¶ 27).

The search warrant was executed on February 23, 2017, and several digital storage devices were seized from the residence. A later forensic examination of the Seagate hard drive revealed over a thousand images of suspected child pornography.

On February 23, 2017, Det. Kalmer and Det. J. Hurd made contact with Lisa Riddick outside of the residence and advised her of the nature of the search and seizure warrant.  Ms. Riddick advised she lived in the house with her husband, Edgar Riddick, and her daughter, B.R.

Ms. Riddick stated that Mr. Riddick would normally hangout in the computer room or where the other television was because they watched separate shows.

FBI Special Agent Aaron Hurst and FBI Special Agent Josh Hubbard interviewed Lisa Riddick and B.R..  Neither of them disclosed any knowledge of Mr. Riddick, or anyone else in the residence, downloading sexually explicit images of children.

At the time of the execution of the warrant, Riddick was not at home.  Riddick subsequently returned to the residence.  Det. Kalmer and Det. J. Hurd made contact with Edgar Riddick, who was seated at the kitchen table.  Det. Kalmer and Det. J. Hurd identified themselves as being with the Internet Crimes Against Children Task Force.  Riddick was advised that he was not under arrest and he was free to leave the residence.  Riddick stated he understood and he would stay anyway because we were in his residence and he needed to be there for his wife.

At approximately 8:25 a.m., Det. Hurd with Det. Kalmer witnessing, advised Riddick of his Miranda Rights utilizing the LRPD Miranda Rights Form.  Riddick waived his rights and agreed to give a statement.  The statement was digitally recorded.

Riddick admitted to having a Chatstep account and logging on using different personas. Riddick stated he has internet at his residence through Xfinity (Comcast) and advised the name of the Wi-Fi was *Tower of Millwan* and it was password protected.  During the interview, Riddick was asked if he ever uploaded or viewed any sexually explicit images of children and he stated he had viewed images other users sent on Chatstep but never intentionally downloaded or uploaded the images.  Riddick admitted to viewing and exchanging adult pornography with other users in Chatstep.  Detectives asked Riddick if he knew very much about computers and he stated he did not know a lot.  Riddick stated multiple times during the interview his computer was hacked and

taken over.  He stated his computer would get multiple pop-ups, almost like his computer was being taken over.  Riddick stated he took his computer to Best Buy on Cantrell approximately ten (10) to fourteen (14) days prior to have it cleaned.  Riddick was advised the Little Rock Police Department received several CyberTips from NCMEC regarding images being uploaded in Chatstep.  Riddick stated he did not want to say anything to incriminate himself.  Detectives asked Riddick if he ever viewed or uploaded sexually explicit images of children at his business, Riddick Engineering, located at 4600 West Markham.   Riddick stated he usually looked at adult pornography at his residence but he could not 100% say yes or no, so he was not sure.  Detectives advised Riddick there were Cybertips from NCMEC regarding images being uploaded in Chatstep. Riddick stated several times during the interview that he did not want to say anything to incriminate himself.  Several times during the interview, when Riddick was asked specific questions in regards to sexually explicit images of children he would have to take a break and go to the bathroom. Riddick was told several times he was not under arrest and could leave at any time, Riddick stated he understood but wanted to stay at the residence because it was his house and wanted to be there for his wife.  Riddick stated he understood he could request a lawyer at any time if he wanted to. Riddick admitted to using SD cards in cameras to download images and he would bring them home to view.  He also advised he had several discs containing adult pornography in his office drawer.

Agents seized multiple electronic devices from the residence.  A Seagate hard drive seized from the residence revealed over 1,000 images of child pornography.

## II.        ARGUMENT AND AUTHORITY

### A.        The Defendant had no reasonable expectation of privacy in his IP address.

The defendant argues that by tracking the defendant's movements from chatroom to chatroom, via his IP address, "implicates the same privacy concerns the Court found are implicated in tracking one's movements in the physical world – it reveals the privacies of our lives." (Doc. No. 23). He further contends that "[r]ecords from chatroom platforms identifying the rooms that a user frequents reveal the person aspects of an individual's life that concerned the *Carpenter* Court." (*Id.*). This is not a tenable extension of the *Carpenter* holding. Specifically, an individual has no reasonable expectation of privacy in his IP address.

The Supreme Court has consistently held, "the ultimate touchstone of the Fourth Amendment is reasonableness." *Brigham City v. Stuart,* 547 U.S. 398, 403, 126 S.Ct. 1943 (2006). The Supreme Court has held reasonableness protects individuals that "seek to preserve something as private" if their expectation of privacy is "one society is prepared to recognize as reasonable." *Smith v. Maryland*, 442 U.S. 735, 740 (1979).

On June 22, 2018, the Supreme Court held the warrantless seizure of cell-site-location-information ("CSLI") violates the Fourth Amendment unless exigent circumstances are present. *See Carpenter v. United States*, 138 S. Ct. 2206 (2018). CSLI is a time-stamped data point indicating a phone's physical location within one-eighth to four square miles. A cell phone generates CSLI simply by being on. *Id*. at 2211. Once on, the cell phone searches for the strongest signal, which is generally the closest cell tower, and marks the time when it connects to a new tower. *Id*. Depending on the distribution of cell towers, usually the more urban the more precise the location, CSLI can be as effective as GPS monitoring. *Id*. at 2211-12. CSLI is

11

collected by commercial cell phone service providers for various business purposes and is generally stored up to five years before being deleted. *Id*. at 2211-2218.

In *Carpenter*, police arrested four men suspected of a string of robberies at Radio Shack and T-Mobile stores in Detroit. One of the men eventually confessed and named 15 accomplices who participated in the heists along with some of their cell phone numbers. *Id*. at 2212.  Based on the confession and a review of the confessing conspirator's cell phone, the FBI applied for and received the cell phone records for several accomplices, including Timothy Carpenter, using a court order issued under the Stored Communications Act.  *Id*.  The officers received Carpenter's cell phone data for 127 days from one wireless provider and two days from a different provider. *Id*.  The CSLI showed Carpenter's phone was near four of the robberies when they occurred.  *Id*. at 2213. Based on this and other evidence, Carpenter was eventually convicted of numerous counts related to the robbery spree.  *Id*.

Carpenter filed a motion to suppress the CSLI obtained from his wireless carriers in the District Court and again on appeal in the Sixth Circuit. *Id*.  Both courts denied this motion by reasoning Carpenter did not have a reasonable expectation of privacy in non-content information given to his wireless carriers. *Id*.. The Supreme Court granted certiorari and reversed the Sixth Circuit.

The *Carpenter* Court believed CSLI is essentially a GPS system monitoring every American's physical movements for the last five years. They determined the Government needs to get a warrant before they acquire CSLI because society has recognized a legitimate expectation of privacy in records chronicling an individual's every physical movement for months if not years. The Court explained, "Unlike the bugged container in *Knotts* or the car in

*Jones*, a cell phone…tracks nearly exactly the movements of its owner…Accordingly, when the Government tracks the location of a cell phone it achieves near perfect surveillance". *Carpenter*, 585 U.S. at 2218. The Court emphasized the incredible level of detail CSLI provides by virtue of people carrying their cell phones on their person everywhere.  *Id*.  The officer in *Jones* could only monitor the movements of the suspect's car, which rarely leave public scrutiny, but a phone is frequently away from public scrutiny, thus increasing the intrusiveness of the search. *Id*.

After clarifying that society recognizes people have a reasonable expectation of privacy in their CSLI, the Court explained why the third-party doctrine does not apply to CSLI.  *Id.* at 2219-2220. The Court highlighted two differences between CSLI and the information previously requested under the third party-doctrine that makes the doctrine inapplicable to CSLI. *Id*.  First, they pointed out the incredible detail, history, and type of data CSLI makes available, "this case is not about 'using a phone' or a person's movements at a particular time. It is about a *detailed chronicle* of a person's *physical presence* compiled every day*, every moment, over several years*." *Id*. at 2220. This data is much more detailed and extensive than bank documents from a specific bank or the phone numbers an individual dials from a specific phone. *Id*. at 2216.  The second basis for determining third-party doctrine, voluntary conveyance, was inapplicable to CSLI because a cell phone generates the data "by dint of its operation without any affirmative action on the part of the user beyond powering up." *Id*. at 2220. The Court was concerned there was no voluntary transfer of information to a third-party because the data was collected without any action by the owners besides turning the phone on. *Id*.  Based on all this, the Court concluded the third-party doctrine was simply not applicable "in light of the deeply revealing

nature of CSLI, its depth, breadth, and comprehensive reach, and the inescapable automatic nature of its collection." *Id*. at 2223

The foundation for the Court's holding in *Carpenter* makes clear CSLI is a very special type of data with incredibly unique characteristics that require the Government to acquire a warrant before accessing. The self-declared narrow holding in *Carpenter* has no bearing for the data collected in this case. The data collected from Chatstep.com does not carry the same concerns the Court emphasized for CSLI as it does not track the defendant's physical location.

The Court determined CSLI provided the government with the ability to track individuals' physical movements in public or private because modern individuals always carry their phones on their person. *Id*. An individual's physical movements have long been considered protected under the Fourth Amendment and society has recognized that expectation as reasonable even when we are in public. See *United States v. Jones* 565 U.S. 400, 408 (2012). Unlike tracking our physical movements across the whole country, if not the world, tracking someone's cyber persona through a single website's chatrooms is not an expectation of privacy society is prepared to recognize. Similar to the pen register in *United States v. Smith*, people are aware their online activity is heavily monitored for a variety of reasons including advertising, especially when they access third-party sites and use services on those sites. 442 U.S. 735, 741 (1979). Even if society has recognized a lesser privacy interest in a digital persona's online movements, it does not mean the data requested from Chatstep.com requires a warrant because the intrusion is much smaller than CSLI.

The data requested from Chatstep.com, a single website the defendant digitally visited, was much more limited than CSLI. Unlike CSLI, which provides information on every physical

14

movement, the data at issue in this case only provides information on very limited digital movements within a single website, Chatstep.com. This is clearly different from CSLI that provides detailed data on every physical movement a person makes, not simply data about movement in a predesignated zone. It was not a request to the Internet Service Provider, in this case Comcast, for records of every website all the IP addresses associated with a single account had visited over the course of years.

In any event, the defendant had a Dynamic IP address, meaning that the IP address assigned to his account by Comcast can, and frequently does, change at Comcast's discretion. To even come close to  tracking a suspect's every movement in the digital sphere, the Government would have to know every IP address assigned to the defendant during the requested time period. This applies whether the Government wants to track movements across the whole internet or even within a single site, e.g. Chatstep.com. It is very possible that there are more IP addresses associated with the defendant's Comcast account that accessed Chatstep.com. The Government was able to associate four IP addresses from multiple NCMEC CyberTipline reports with the defendant and asked Chatstep.com for records relevant to the IPs mentioned in the reports. Far from tracking the defendant's every digital movement on the internet, it is likely that the Government did not even track his every movement on Chatstep.com.

Finally, the Court stressed the third-party doctrine rests on the idea of voluntarily conveying information. *See Carpenter*, 138 S.Ct. at 2210. The idea of a voluntary conveyance carries with it strong connotations of affirmative actions. *Id*.  The Court distinguished CSLI as not voluntarily conveyed because it requires no affirmative action besides the cell phone being turned on and kept on your person. *Id*. They also emphasized cell phones were such a pervasive

part of modern society as to almost be mistaken as a part of the "human anatomy". *Id*. at 2218

(quoting *Riley v United States*, 134 S.Ct 2473, 2484 (2014)). The Court determined simply

walking around with a cell phone was not enough to declare the party was voluntarily giving up

their location data to anyone. *Id*.  The conveyance of data in this case requires much clearer

affirmative action than the conveyance of CSLI, placing it more in line with the pen register at

issue in *Smith*. In *Smith*, placing a call "voluntarily conveyed" the dialed numbers to the phone

company. *Smith*, 442 U.S. at 744. Similarly, the defendant voluntarily conveyed his data to

Chatstep.com when he turned his computer on, opened his internet browser, went to their

website, Chatstep.com, created or logged into an account with Chatstep.com, and finally created

a room or affirmatively selected a room from a list and entered it. These actions "exposed that

information" to Chatstep.com's "equipment in the ordinary course of business." *Id.* at 744

(internal quotation marks omitted). Unlike, CSLI, which does not requires use of the cell phone's

services to record CSLI, Riddick had to take multiple affirmative actions including accessing

Chatstep.com and selecting or creating a room to enter before any data was collected by

Chatstep.com.

  In *Carpenter*, The Court explained that the third-party doctrine is not applicable to CSLI

because CSLI "provides an intimate window into a person's life, revealing not only his particular

movements, but through them his 'familial, political, professional, religious, and sexual

associations.'" The defense appears to assert that this single quote means any data that reveals

intimate associations requires a warrant before the being seized. What the defense fails to

account for is that quote comes after the Court declares the third-party doctrine is inapplicable to

CSLI and is in reference to a chronicling an individual's every physical movements over years,

an incredibly detailed and intrusive invasion into a recognized sphere of protection under the Fourth Amendment. *See Carpenter*, 138 S.Ct. at 2217. Just because certain information might reveal intimate associations is not enough, standing alone, to overrule the third-party doctrine. The phone numbers in *Smith* or bank records in *United States v. Miller*, 425 U.S. 435 (1976), could have easily revealed the existence of familial, political, professional, religious and sexual associations as well. All of these reveal the intimate associations of a defendant, but the Supreme Court has allowed the Government to seize the data without implicating the Fourth Amendment or imposing a warrant requirement. *See Smith*, 442 U.S. at 744; *Miller* 425 U.S. at 438. Full consideration of the reasoning in *Carpenter* indicates that the petitioners in *Smith* and *Miller* affirmatively and voluntarily conveyed data that did not implicate their physical integrity to a third-party. *Carpenter*, 138 S.Ct. at 2226-2227. These factors made the data in those cases and the data in this case appropriate for seizure under the third-party doctrine without a warrant.

In *United States v. Contreras*, the Fifth Circuit, post-*Carpenter*, found that the defendant lacked a reasonable expectation of privacy in his family's IP address in internet provider's records.  No. 17-11271, 2018 WL 4689962 *2 (5th Cir. Oct. 1, 2018).  In doing so, the Court reasoned that "the third-party doctrine has limits: in *Carpenter*, the Supreme Court declined to extend the rule to cell-site records that convey 'a detailed and comprehensive record of a person's movements.' But the third party doctrine continues to apply to 'business records that might incidentally reveal location information,' including telephone numbers and bank records.'" *Id*.  The Fifth Circuit stated that IP information "falls comfortably within the scope of the third party doctrine.  The internet service provider's records revealed only that the IP address was associated with the Contreras's Brownwood residence. They had no bearing on any person's

17

day-to-day movement. Contreras lacked a reasonable expectation of privacy in that information."
*Id*.

The Eighth Circuit has held that a defendant had no reasonable expectation of privacy in the United States' acquisition of subscriber information, including his IP address and name form third-party service providers.  *United States v. Wheelock*, 772 F.3d 825, 828 (8th Cir. 2014) (citing *United States v. Perrine*, 518 F.3d 1196, 1204-05 (10th Cir. 2008) ("Every federal court to address this issue has held that subscriber information provided to an internet provider is not protected by the Fourth Amendment's privacy expectation.").  "[E]mail and Internet users have no expectation of privacy in the to/from addresses of their messages or the IP addresses of the websites they visit because they should know that this information is provided to and used by Internet service providers for the specific purpose of directing the routing of information."
*United States v. Stults*, 575 F.3d 834 (8th Cir. 2009); *United States v. Forrester*, 512 F.3d 500, 509-11 (8th Cir. 1999).  "Like telephone numbers, which provide instructions to the 'switching equipment that processed those numbers,' email to/from addresses and IP addresses are not merely passively conveyed through third party equipment, but rather are voluntarily turned over in order to direct the third party's servers."  *Id*. (citing *Smith*, 442 U.S. at 744).

The privacy interest in an IP address does not rise to the level of the evidence in *Carpenter* such that it would require law enforcement to obtain a search warrant. Even after obtaining the IP addresses, numerous additional investigatory steps were necessary before law enforcement was able to identify the defendant as an individual suspect. First, they had to identify the internet service that controlled the IP address. Second, they subpoenaed the internet service provider for subscriber information.  Third, they conducted surveillance and took other

traditional investigatory steps detailed in the search warrant affidavit. Fourth, they applied for and were granted the search warrant for the residence.  Finally, they interviewed the defendant and reviewed his electronic devices pursuant to the warrant.  Thus obtaining an IP address is a far cry from the "near perfect surveillance" of CSLI that concerned the Supreme Court in *Carpenter*. This Court should likewise decline to extend the expressly narrow decision in *Carpenter* to IP addresses.

For these reasons, the Court should deny defendant's Motion to Suppress Evidence Obtained from Warrantless Seizure From ChatStep (Doc. No. 23).

**B.     Chatstep did not provide evidence that exceeded the scope of the warrant.**

The defendant contends that ChatStep provided information concerning all of the defendant's IP addresses based on one search warrant Det. Kalmer sent to ChatStep  (Doc. No. 24).  This is incorrect.  As noted in the footnotes above, at the time of the filing of the defendant's motions to suppress, including document 24, neither the defense nor the United States had copies of all the subpoenas served on ChatStep.  Those copies have since been provided to defense counsel.  As set forth below, ChatStep properly provided information concerning the defendant's IP addresses when served with legal process.

On August 18, 2016, LRPD Det. Jennifer Hurd served a subpoena duces tecum on Chatstep.com for:

> Any and all records regarding the identification of the individual using the IP address 71.238.241.25 05-30-2016 04:17:54 UTC to include port number, name, address, date account created, account status, email address, alternate email address, registration from IP, date IP address registered, log in IP addresses associated with session times and dates, detailed billing logs, date account opened and closed, method of payment and detailed billing records (log on & log off times).

(Ex. 2). ChatStep responded with information revealing the dates, times, usernames, and the room

names entered into by the IP address 71.238.241.25 from March 30, 2015 to August 18, 2016.

(Ex. 2). As discussed above, ChatStep did not provide any physical location information. Chatstep

did not provide this information in response to Det. Kalmer's search warrant, which is attached as

Exhibit 3.

On February 14, 2017, Det. Kalmer sent a search warrant to ChatStep for:

Any and all information data and/or content associated with the personal cloud
storage user account connected to the Chatstep account for screen/user name:
Mom45    Room:    Nude    Port:    49823    and    IP    address
2601.381.8105.1e30:864:e60c:13ed:ea05, and any remote storage location
connected to the above account, to include the following (if known and if available)
. . . 5. IP addresses associated with account access, to include the most recent IP
address recorded for the last account access and IP addresses recorded for data
content uploads." (Ex. 3).

ChatStep then provided four instances that IP address 2601.381.8105.1e30:864:e60c:13ed:ea05

entered rooms in Chatstep. (Ex. 3). Chatstep did not exceed the scope of the warrant by providing

the other instances that IP address 2601.381.8105.1e30:864:e60c:13ed:ea05 entered rooms on

Chatstep because the warrant specifically provided for IP addresses associated with account access

and IP addresses recorded.

On February 15, 2017, LRPD Det. Kalmer served a subpoena duces tecum on

Chatstep.com for:

Any and all records regarding the identification of the individual using the IP
address 2601:381:8105:1e30:8438:8cd8:e193:5499 01-02-2017 19:53:37 UTC to
include port number, name, address, date account created, account status, email
address, alternate email address, registration from IP, date IP address registered,
log in IP addresses associated with session times and dates, detailed billing logs,
date account opened and closed, method of payment and detailed billing records
(log on & log off times).

(Ex. 4).  ChatStep responded by providing nine instances that IP address

2601:381:8105:1e30:8438:8cd8:e193:5499 entered rooms in Chatstep from November 4, 2016 to

February 20, 2017.  Chatstep did not provide this information in response to Det. Kalmer's

search warrant which is attached as Exhibit 3.

On February 16, 2017, LRPD Det. Kalmer served a subpoena duces tecum on

Chatstep.com for:

> Any and all records regarding the identification of the individual using the IP
> address  2601.381.8105.1e30:459f:6048:76e:5f8  01-04-2017  14:58:58  UTC  to
> include name, address, date account created, account status, email address, alternate
> email address, registration from IP, date IP address registered, log in IP addresses
> associated with session times and dates, detailed billing logs, date account opened
> and closed, method of payment and detailed billing records (log on & log off times).

(Ex. 5).   ChatStep responded  by  providing  seven  pages  of  instances  that  IP  address

2601.381.8105.1e30:459f:6048:76e:5f8 entered rooms in Chatstep from November 4, 2016 to

February 20, 2017.  (Ex. 5).  Chatstep did not provide this information in response to Det. Kalmer's

search warrant which is attached as Exhibit 3.

In this case, Det. Kalmer lawfully obtained data from ChatStep via subpoenas and a

search warrant.  Chatstep did not provide information outside the scope of the warrant issued

and, as discussed above, information relating to the defendant's IP addresses was properly

disclosed via subpoena.

For these reasons, defendant's Motion to Suppress Evidence from ChatStep that

Exceeded Scope of the Warrant (Doc. No. 24) should be denied.

**C.     The search of the defendant's residence was based on probable cause.**

The defendant argues in his Motion to Suppress Evidence From Search of Residence and

Request for Voluntariness Hearing (Doc. No. 26) that the search warrant was based "on an

affidavit that contains illegally obtained information."  In support, the defendant relies on its assertions in its Motion to Suppress Evidence from ChatStep that Exceeded Scope of the Warrant (Doc. No. 24) that Chatstep exceeded the scope of the search warrant and provided information related to other IP addresses.  The defendant concedes in his motion that "the determination of this motion will be based on this Court's determination of our Motion to Suppress Evidence From ChatStep That Exceeded the Scope of the Warrant." The defendant maintains that "our position is that the warrant only authorized the seizure of information related to a Chatstep account pertaining to Mom45 Room: Nude Port:49823 and IP address 2601.381.8105.1e30:864:e60c:13ed:ea05 on December 23, 2016. That information is contained in paragraphs 3 and 4 of Kalmer's affidavit for the warrant to search Riddick's home."  (Doc. No. 26).  However, the information provided by ChatStep related to the other IP addresses was obtained via subpoena, not as a result of the search warrant.  Furthermore, as discussed above, the search warrant authorized ChatStep to provide information concerning IP address 2601.381.8105.1e30:864:e60c:13ed:ea05.  In short, ChatStep did not overproduce. Therefore, the information was properly obtained and the defendant's Motion to Suppress Evidence From Search of Residence (Doc. No. 26) should be denied.

The defendant contends that the information contained in paragraphs 1 and 2, 5 thru 8, and 10 thru 13 were illegally obtained because ChatStep provided information outside of the search warrant.  Paragraph 1 and 2 relate to information obtained from NCMEC, not information provided to LRPD from ChatStep via subpoena or a search warrant.  Therefore, these paragraphs do not even relate to defendant's argument.  The same applies for paragraphs 5 thru 8, which relate to information provided by NCMEC to LRPD, not

information provided by ChatStep via subpoena or a search warrant.  As discussed above, ChatStep properly responded via subpoena or search warrant in providing the information contained in paragraphs 10 through 13.  Therefore, all of this information was legally in the search warrant.

The defendant cites non-binding authority in support of his position that after taking out the above referenced paragraphs, there was not probable cause to issue the warrant because the remaining information was stale and failed to establish probable cause.  This is simply not true.  Even if the Court finds that paragraphs 1 and 2, 5 thru 8, and 10 thru 13, should be stricken from the search warrant, the warrant still contained probable cause.  In paragraph 3, Det. Kalmer established that a person using IP address 2601.381.8105.1e30:864:e60c:13ed:ea05 uploaded an image of child pornography to ChatStep on December 23, 2016.  In paragraph 15, Det. Kalmer established that IP address 2601.381.8105.1e30:864:e60c:13ed:ea05 was subscribed to Edgar Riddick at 7 Greenbrier Road, Little Rock, AR 72202.  In paragraph 18, Det. Kalmer established that through surveillance she observed two vehicles registered to Edgar Riddick at 7 Greenbrier Road, Little Rock, AR.

In *United States v. Chrobak*, the Eighth Circuit found sufficient probable cause for a search warrant based on a single transmission of child pornography that was traced back to the defendant's residence.  289 F.3d 1043 (8th Cir. 2002).  Specifically, the search warrant was based on a single transmission of 14 images, some of which contained child pornography on July 27, 1998.  *Id*. at 1044.  The images were sent to a newsgroup website by an individual who identified himself as Post@them.now.  *Id*.  "The records of

Post@them.now's internet service provider revealed the moniker was registered to one Daniel Chrobak of North Little Rock, Arkansas." *Id*. The FBI was able to identify Chrobak's residence and obtained a search warrant for his residence. *Id*. A search warrant was executed at Chrobak's residence on October 27, 1998 – 91 days after the first and only transmission of child pornography. *Id*. at 1045. Chrobak argued that there was not probable cause for the issuance of the warrant because someone else could have used his email address and the images were "transmitted ninety-one days prior to execution of the warrant and asserts that evidence was too stale to provide probable cause that images" would be found at his residence. *Id*. at 1046. The Eighth Circuit found that agents "established a sufficient nexus between the transfer and Chrobak's house by providing evidence that he lived there and that, in her [the agent's] experience, pedophiles maintain their child pornography in a secure place." *Id*. The Court also found that the probable cause was not stale. *Id*.

"In the Eighth Circuit, for the purposes of determining whether probable cause exists to search a computer, an IP address assigned to a specific user at the time illegal internet activity associated with that IP address occurs is a sufficient basis to find a nexus between the unlawful use of the internet at that IP address and a computer possessed by the subscriber assigned the address." *United States v. Reibert*, No. 8:13CR107, 2015 WL 366716, at *3 (D. Neb. Jan. 27, 2015) (citing *United States v. Stults,* 575 F.3d 834, 843–44 (8th Cir. 2009) (holding that probable cause supported warrant where officers used IP address to identify possessor of child pornography on a file-sharing network); *United States v. Perrine,* 518 F.3d 1196, 1205–06 (10th Cir. 2008) (upholding probable cause where

pornographic images were traced to defendant's residence using IP address); *United States v. Perez,* 484 F.3d 735 (5th Cir. 2007)(the IP address provided "a substantial basis to conclude that evidence of criminal activity" would be found at the defendant's home, even if it did not conclusively link the pornography to the residence); *United States v. Wagers,* 452 F.3d 534, 539 (6th Cir. 2006) (upholding probable cause where suspect was identified as a member of child pornography websites through an IP address assigned to his residence; *United States v. Hay,* 231 F.3d 630, 635–36 (9th Cir. 2000) (finding a substantial basis for magistrate's probable cause determination where images of child pornography were traced to defendant using an IP address).

In this case, the IP address was traced back to the defendant's residence. Det. Kalmer established surveillance and observed two vehicles registered to the defendant at the residence. As in *Chrobak,* Det. Kalmer established a sufficient nexus between the upload of child pornography via the defendant's IP address and his residence. She further established in her affidavit that pedophiles maintain their child pornography in a secure place.

Furthermore, the search warrant was not based on stale information. Paragraph 3 describes that the defendant's IP address uploaded an image of child pornography on December 23, 2016. The search warrant in this case was executed on February 23, 2017 – approximately 60 days after the upload of child pornography. As the Court found in *Chrobak*, this lapse of time does not render the probable cause stale.

"A warrant becomes stale if the information supporting it is not 'sufficiently close in time to the issuance of the warrant and the subsequent search conducted so that probable cause can be

said to exist as of the time of the search." *United States v. Johnson*, 848 F.3d 872, 877 (8th Cir.

2017) (quoting *United States v. Lemon*, 590 F.3d 612, 614 (8th Cir. 2010)).  "[T]here is no

bright-line test for determining when information is stale ... time factors must be examined in the

context of a specific case and the nature of the crime under investigation." *Id*.  "Important

factors to consider in determining whether probable cause has dissipated . . . include the lapse of

time since the warrant was issued, the nature of the criminal activity, and the kind of property

subject to the search." *Id*.  "A lapse of time is least important when the suspected criminal

activity is continuing in nature and when the property is not likely to be destroyed or dissipated."

*Id*.

The defendant cites two non-binding cases to support his argument that the probable

cause set forth in paragraph 3 was stale.  However, the Eighth Circuit has held that the passing of

more significant periods of time, much more so than 60 days, does not render the probable cause

in a search warrant stale.  In *Johnson*, the Eighth Circuit held that a lapse of eleven months

between the date alleged child pornography pictures were downloaded to the computer and the

issuance of the search warrant was not stale.  *Id*. at 877.  *See also United States v. Lemon*, 590

F.3d at 614 (holding that 18 month gap between the defendant's last exchange of child

pornography and application for search warrant was not stale); *United States v. Morales–

Aldahondo*, 524 F.3d 115, 119 (1st Cir. 2008) (holding that three year lapse between defendant's

purchase of child pornography and warrant application was not stale).

The search warrant established probable cause that the defendant distributed, possessed

and viewed child pornography.  Furthermore, as established in Det. Kalmer's affidavit,

individuals who view child pornography maintain it for several years and keep it in close

proximity.  (Ex. 1, ¶ 23).  The lapse of approximately 60 days in executing the search warrant did not render it stale.

Lastly, the search warrant authorized searching for evidence of user attribution.  Evidence of user attribution will nearly always be on a computer.  Such evidence could feasibly include use of ChatStep, photographs, documents, word processing documents, spreadsheets, computer programs, etc.  These sorts of files remain on computers, often indefinitely, but certainly more than sixty days.  Thus, the warrant was not stale, and law enforcement executed the warrant in good faith reliance on the warrant.  *Leon*, 468 U.S. at 922.

### D.     The defendant's post-*Miranda* statement was voluntary.

The defendant argues that his statement, taken during the execution of the search warrant, was a result of the illegally seized information found in the affidavit and must be suppressed.  It appears defendant makes a similar argument in his Motion to Suppress Evidence from Illegal Traffic Stop (Doc. No. 27), in that he argues he was unlawfully detained; therefore, any statement made after the unlawful detention was not voluntary.

First and foremost, as discussed above, the search warrant was based on probable cause and not on illegally seized information.  Nevertheless, if the Court determines that the search warrant was based on illegally seized information, the defendant's statement was still voluntary.  Officers executed the warrant in good faith, and the defendant, who was not in custody, voluntarily consented to an interview post-*Miranda*.  "An individual's waiver of the Fifth Amendment privilege against self-incrimination . .. is valid if made voluntarily, knowingly and intelligently."  *United States v. Crisolis-Gonzalez*, 742 F.3d 830, 838 (8th Cir. 2014) (quoting *United States v. Harper*, 466 F.3d 634, 643 (8th Cir. 2006).  The Court looks to the totality of the

27

circumstances in determining the voluntariness of a statement. *Id.*

> The trial judge in determining the issue of voluntariness shall take into consideration all the circumstances surrounding the giving of the confession, including (1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment; (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession; (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement can be used against him; (4) whether or not such defendant had been advised prior to questioning of his right to assistance of counsel; and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession. The presence or absence of any of the above-mentioned factors to be taken into consideration by the judge need not be conclusive on the issue of voluntariness of the confession.

18 U.S.C. § 3501(b).

Here, the defendant was not under arrest or in custody at the time he made the statement, he was aware of the nature of the investigation, and he had been advised of his Miranda rights even though he was not in custody.  Other than the alleged illegal search and detention, the defendant has articulated no basis for a finding that the statement was involuntarily given and the totality of the circumstances weigh in favor of admission of the statement.

### i.      Application of the exclusionary rule is not appropriate under the attenuation doctrine.

Evidence should only be excluded if the "illegality is at least a but-for cause of obtaining the evidence." *United States v. Hastings*, 685 F.3d 724, 728 (8th Cir. 2012).  The defendant "bears the burden of establishing a nexus between the alleged constitutional violation" and the evidence obtained. *Id. See also United States v. Ellis*, 501 F.3d 958, 963 (8th Cir. 2007) (denying motion to suppress statement defendant made after given Miranda warnings at the police station) (citing *United States v. Marasco,* 487 F.3d 543, 548 (8th Cir.2007) (reversing the grant of a motion to suppress because the defendant could not prove that a Fourth Amendment

violation was the but-for cause of her statements); *United States v. Gipp,* 147 F.3d 680, 685 (8th Cir.1998) (stating that because there was not an illegal seizure "the district court did not err in denying appellant's motion to suppress evidence and statements obtained as a result of the ... investigatory stop")). The defendant cannot meet his burden.

Also, the attenuation doctrine is an established exception to the exclusionary rule. *United States v. Dickson*, 64 F.3d 409, 410 (8th Cir. 1995). The Eighth Circuit has held that some intervening voluntary acts on the part of a defendant, such as consenting to a search, may be sufficient to purge the taint of an illegality. *See, e.g., id.* at 410-11; *United States v. Ramos*, 42 F.3d 1160, 1163-64 (8th Cir. 1994) (overruled on other grounds). The factors to be considered in determining whether the taint is purged are: "(1) the temporal proximity between the illegal search or seizure and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct." *United States v. Becker*, 333 F.3d 858, 862 (8th Cir. 2003).

Under Eighth Circuit precedent, fifteen minutes is sufficient to demonstrate an attenuation of any illegality. *United States v. Whisenton*, 765 F.3d 938, 942 (8th Cir. 2014). *See also United States v. Herrera-Gonzalez*, 474 F.3d 1105, 1112 (8th Cir. 2007) (finding that while ten minutes does not in itself suggest sufficient attenuation to purge the taint of the stop, neither does it compel the conclusion that the attenuation was insufficient).

Here, law enforcement did not act in bad faith. *Herrera-Gonzalez*, 474 F.3d at 1113 n.5 (noting that the Eighth Circuit has found consent sufficient to purge a taint even in the absence of intervening circumstances where the circumstances suggest that the officer was not trying to exploit an illegal situation and his conduct was in good faith) (citing cases). It is clear that law

enforcement was not attempting to exploit an illegal situation and believed that they acted in accordance with the law.

The defendant cites *Brown v. Illinois*, for his proposition that the defendant's post-*Miranda* interview was the product of illegally seized information.  "In *Brown*, the Court held that, to determine whether the causal connection between incriminating statements and an arrest or search that violated the Fourth Amendment has been broken, Miranda warnings—which protect Fifth Amendment rights—are relevant but other factors must be considered—the 'temporal proximity' of the unconstitutional conduct and the statements, the 'presence of intervening circumstances,' and 'particularly, the purpose and flagrancy of the official misconduct.'"  *United States v. Yorgensen*, 845 F.3d 908, 914 (8th Cir.), cert. denied, 138 S. Ct. 89, 199 L. Ed. 2d 57 (2017).  "Providing *Miranda* warnings is an 'important, although not dispositive,' factor that weighs against suppression . . ."  *Id*.  "Persons arrested illegally frequently may decide to confess, as an act of free will unaffected by the initial illegality."  *Id*.

In this case, the search of the defendant's residence began at 7:00 a.m.   While the defendant was not at the residence at the initial entry to the residence, he was brought back to the residence shortly thereafter.  It was not until 8:25 a.m. that he was interviewed.  A transcript of the interview is attached as Exhibit 6.  The defendant's signed Miranda form is attached as Exhibit 7.  Therefore, there appears to be a sufficient temporal span between when the search began and the defendant was interviewed.

As to the presence of intervening circumstances, the defendant was advised of his *Miranda* rights prior to his interview at his residence and signed a document acknowledging such.  (Ex. 6, pp. 001-007, Ex. 7).  *See Ramos*, 42 F.3d at 1163-64 (holding that the defendant's

voluntarily signing the consent form was sufficiently an act of free will to purge the taint of the preceding illegal detention and finding the evidence discovered by the consent-to search was admissible).  During the interview, the defendant stated that he freely came back to the residence and acknowledged that he was not under arrest.  (Ex. 6, pp. 004).  Det. Hurd told him that he was free to leave at any time and not under arrest.  (Ex. 6, pp. 004).  The defendant stated that he was there for his wife.  (Ex. 6, pp. 004).  The defendant further stated that he knew he could revoke consent at any time.  (Ex. 6, p. 007).  Based on these facts, it is clear there was no flagrant official misconduct and that the defendant's waiver of his *Miranda* warnings was not the product of any illegal search or seizure.

> ### ii.     Application of the exclusionary rule would not result in appreciable deterrence.

Finally, even if the Court finds a Fourth Amendment violation, application of the exclusionary rule would not result in appreciable deterrence.

> "[T]he Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands." *Arizona v. Evans,* 514 U.S. 1, 10, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995). Rather, exclusion of evidence is "a judicially created rule ... 'designed to safeguard Fourth Amendment rights generally through its deterrent effect.' " *Herring,* 129 S.Ct. at 699 (quoting *United States v. Calandra,* 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974)). "Indeed, exclusion has always been our last resort, not our first impulse, and [Supreme Court] precedents establish important principles that constrain application of the exclusionary rule." *Id.* at 700 (internal citations and quotation marks omitted).
>
> As a judicially-created remedy, the exclusionary rule applies only where "its remedial objectives are thought most efficaciously served." *Evans,* 514 U.S. at 11, 115 S.Ct. 1185. The exclusionary rule is not an individual right, but it "applies only where it 'results in *appreciable deterrence.*' " *Herring,* 129 S.Ct. at 700 (quoting *United States v. Leon,* 468 U.S. 897, 909, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)) (emphasis added) (some internal marks omitted); *see also Penn. Bd. of Probation & Parole v. Scott,* 524 U.S. 357, 368, 118 S.Ct. 2014, 141 L.Ed.2d 344 (1998) ("We have never suggested that the exclusionary rule must apply in every circumstance

in which it might provide marginal deterrence."). The Court also balances the benefits of deterrence against the costs of excluding the evidence, particularly the social costs of "letting guilty and possibly dangerous defendants go free— something that 'offends basic concepts of the criminal justice system.' " *Herring,* 129 S.Ct. at 701 (quoting *Leon,* 468 U.S. at 908, 104 S.Ct. 3405). Finally, the Supreme Court includes "an assessment of the flagrancy of the police misconduct" in its calculus of whether the exclusionary rule should be applied. *Id.* (internal marks omitted).

*United States v. Hamilton*, 591 F.3d 1017, 1027–28 (8th Cir. 2010).

The law enforcement officers involved in this investigation had no reason to believe that they acted in violation of the Fourth Amendment. They acted in good faith. Suppression would undermine the truth-seeking function of the judicial system. Therefore, the defendant's statement was voluntary and a hearing is not necessary.

**E.    Officers acted in good-faith in issuing the subpoenas and search warrant to ChatStep, and in executing the search warrant at the defendant's residence.**

Even if this Court determines that the affidavit was based on illegally seized information, that does not automatically result in the suppression of evidence obtained during the execution of the search warrant. The "exclusionary rule is not applied in cases 'when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope.'" *United States v. Fiorito*, 640 F.3d 338, 345 (8th Cir. 2011) (quoting *United States v. Leon*, 468 U.S. 897, 920 (1984)). "In cases of good faith, the evidence, although seized pursuant to a warrant that lacked probable cause, nonetheless is admissible at trial." *Id*

"*Leon* identified four circumstances in which an officer's reliance on a warrant is not in objective good faith:  (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge wholly abandoned her judicial role in

issuing the warrant; (3) when the affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) when the warrant is so facially deficient that no police officer could reasonably presume the warrant to be valid." *Id*. "Entirely unreasonable is not a phrase often used by the Supreme Court, and we find nothing in *Leon* or in the Court's subsequent opinions that would justify our dilution of the Court's particularly strong choice of words." *United States v. Ross*, 487 F.3d 1120, 1122-23 (8th Cir. 2007).

The defendant has not alleged that Det. Kalmer knowingly and intentionally included a false statement or made one in reckless disregard of the truth. Nor is there an allegation that the warrant itself was facially deficient. It is unclear whether the defendant's assertion that the warrant was based on illegally seized information is intended to argue the second prong, that the issuing judge wholly abandoned her role, or the third prong, that the affidavit so lacks indicia of probable cause as to render official belief in its existence unreasonable. Whether the second or the third prong, or both, is intended, the facts contained in the affidavit provide a connection between the crimes alleged, the place to be searched and the evidence sought. Because the affidavit connected the violations to the defendant, and connected evidence of the violations to the defendant's office and computers, even if there was some deficiency in the factual basis for probable cause in the affidavit, execution of the warrant by the agent was in good faith reliance on the warrant issued by the court.

Furthermore, at the time detectives served the subpoenas on ChatStep for IP information, *Carpenter* had not been decided and was not controlling law. Even if the Court believes the decision in *Carpenter* raises new concerns regarding the acquisition of information by subpoena

or other legal process, considering the existing precedent discussed above at the time the investigation took place, the purpose of the exclusionary rule is to deter future Fourth Amendment violations, not to remedy past ones. *Davis v. United States*, 564 U.S. 229, 236-37 (2011). The Supreme Court has emphasized that "the exclusionary rule is not an individual right and applies only where it 'result[s] in appreciable deterrence.'" *Herring v. United States*, 555 U.S. 135, 141 (2009) (quoting *United States v. Leon*, 468 U.S. 897, 909 (1984)). Because suppression imposes a "costly toll upon truth-seeking and law enforcement objectives" by "letting guilty and possibly dangerous defendants go free," a court must find that "the benefits of deterrence . . . outweigh the costs" before excluding evidence obtained in violation of the Fourth Amendment. *Id.* (citation omitted); *Davis*, 564 U.S. at 237 ("Our cases hold that society must swallow this bitter pill when necessary, but only as a 'last resort.' For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs.") (citation omitted). "[W]hen the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only a simple, isolated negligence, the deterrence rationale loses much of its force and exclusion cannot pay its way." *Davis*, 564 U.S. at 238 (internal citations and quotation marks omitted). Here, law enforcement relied on existing precedent and prior experience using the various forms of legal process to obtain the information necessary for the investigation.

## III.    CONCLUSION

For the reasons set forth above, the United States's requests the Court deny defendant's Motions to Suppress found in document numbers 23, 24, and 26.

Respectfully submitted,

Cody Hiland
United States Attorney


*/s/ Kristin Bryant*
By: KRISTIN BRYANT
Assistant United States Attorney
Bar No. 2009156
P.O. Box 1229
Little Rock, AR 72203
(501) 340-2600
Kristin.Bryant@usdoj.gov


## CERTIFICATE OF SERVICE

I hereby certify that on the 2nd day of November, 2018, I filed the foregoing with the Clerk of the Court and provided a copy to defense counsel.

*Kristin Bryant*
KRISTIN BRYANT