**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

**UNITED STATES OF AMERICA**                                          **PLAINTIFF**

**v.**                          **CASE NO. 4:17-CR-00145 BSM**

**EDGAR K. RIDDICK**                                          **DEFENDANT**

<u>**ORDER**</u>

Defendant Edgar Riddick's motions to suppress [Doc. Nos. 23, 24, 25, 26, 27] are denied.

I.  BACKGROUND

Riddick was indicted on one count of possession of child pornography in violation of 18 U.S.C. section 2252(a)(4)(B) and three counts of distribution of child pornography in violation of 18 U.S.C. section 2252(a)(2).  *See* Doc. No. 3.  He moves to suppress evidence obtained by the Little Rock Police Department ("LRPD").  The events leading up to the seizure of evidence are as follows:

On May 30, 2016, Chatstep, an online chatroom platform, reported to the National Center for Missing and Exploited Children's ("NCMEC") CyberTipline that someone uploaded a suspected image of child pornography to its website.  Chatstep's tip included the image and the following information:  the person went by the username "Missy"; he posted the image in a chatroom called "Nuderoom" at 4:17:54 UTC on May 30, 2016; and he used Internet Protocol ("IP") address 71.238.241.25 (".25").  The CyberTipline reported this information to the LRPD.

Over the following months, Chatstep sent more tips involving suspected child

pornography to NCMEC involving "Missy" and of a person going by usernames "Mom45" and "ccc." NCMEC reported this information to the LRPD, which confirmed that the images were child pornography.

In August 2016, the LRPD subpoenaed Chatstep and Comcast, an internet service provider, to produce additional information about the individual associated with IP address .25. Chatstep identified the dates, times, usernames, and chatroom names linked with IP address .25, and Comcast identified Riddick as the subscriber using this IP address.

In February 2017, the LRPD served additional subpoenas and disclosure orders on Chatstep and Comcast for information about other IP addresses later associated with Riddick. Chatstep provided records connected with those addresses, and Comcast identified Riddick as the subscriber using them.

Later that month, LRPD Detective Amber Kalmer obtained a search warrant on Chatstep for information concerning IP address 2601:381:8105:1e30:864:e60c:13ed:ea05 ("ea05"). The warrant required Chatstep to provide "any and all information, data and/or content associated with the personal cloud storage user account connected to the Chatstep account for screen/user name: Mom45 Room: Nude Port: 49823 and IP address:[ea05][.]" In response, Chatstep provided a one-page document indicating that an individual associated with IP address ea05 and using the username "Mom45" entered the "Nude" chatroom. This document contained information about other usernames associated with IP address ea05.

Kalmer then obtained a warrant to search Riddick's home for digital devices for child

pornography.  During the search, several digital devices were seized.   A forensic analysis of one of these devices—a Seagate hard drive—revealed over one thousand images of suspected child pornography.

Riddick was not at home at the beginning of the search.  Detective Ray Koonce observed Riddick drive away from the house before the search started.  Koonce followed Riddick to a hotel approximately twelve to fifteen miles away, where Riddick picked up a business associate.  Koonce and a uniformed officer, Cheree Carlton, stopped Riddick at the hotel.  Koonce walked up to Riddick's car, and Riddick rolled down his window.  Koonce asked Riddick to step out of the car, patted him down, and told him to stand to the rear of the car with Carlton.  Koonce followed a similar procedure with Riddick's associate.  Koonce then told Riddick that a search warrant was being executed at Riddick's home and requested that Riddick return to the house with him.  Koonce also told Riddick several times that Riddick was not under arrest and was free to leave.

Koonce also asked for consent to search Riddick's car.  Riddick agreed, and he later signed a written consent to search the items found in the car.  Koonce searched the car and seized Riddick's cell phone, laptop, and camera.  Koonce returned Riddick's cell phone after determining that it did not have access the internet or the ability to take photos.  Riddick gave his car to his associate to drive to Stuttgart, Arkansas, for a work-related project.  Riddick then rode home in Carlton's marked squad car.

Riddick was met at his house by Detectives Kalmer and Jennifer Hurd.  He was told

multiple times that he was not under arrest and that he was free to leave.  He was also given a *Miranda* warning.  Riddick agreed to speak with the detectives, although at several points he stated that he did not want to incriminate himself.  It also appears that he made some statements to investigators before the *Miranda* warning.  During his interview with the detectives, Riddick took a number of breaks but was accompanied by an officer during those breaks.

## II.  DISCUSSION

Riddick moves to suppress evidence obtained from Chatstep, evidence from the search of his home, and his statements to investigators.  First, he asserts that the warrantless search and seizure of evidence from Chatstep is unconstitutional under *Carpenter v. United States*, 138 S. Ct. 2206 (2018), and that Chatstep illegally produced evidence that exceeded the scope of the LRPD's search warrant.   Second, he asserts that the warrant for the search of his home was unlawfully obtained because the application for the warrant relied on evidence illegally obtained from Chatstep.  Riddick also argues that the warrant was defective because it was overbroad.  Third, Riddick asserts that any pre- or post-*Miranda* statements given to investigators during the search of his home should be suppressed because they followed an illegal traffic stop and detention.  He also argues that his statements were made involuntarily.

Riddick's motions to suppress are denied because none of his arguments require the suppression of any evidence.

A.    <u>Evidence Obtained From Chatstep</u>

*1. Warrantless Information*

The warrantless evidence obtained from Chatstep does not violate Riddick's rights under the Fourth Amendment because he does not have a reasonable expectation of privacy in his IP address and other non-content information that he shared with Chatstep.  This information was properly disclosed to the LRPD in response to subpoenas and disclosure orders.

"The Fourth Amendment protects the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  *Carpenter*, 138 S. Ct. at 2213 (internal quotation and alterations omitted).  It prohibits the government from intruding into areas where there is a "reasonable expectation of privacy."  *Oliver v. United States*, 466 U.S. 170, 177 (1983) ("Since *Katz v. United States*, 389 U.S. 347 (1967), the touchstone of Fourth Amendment analysis has been the question whether a person has a 'constitutionally protected reasonable expectation of privacy.'").  An individual, however, does not have a reasonable expectation of privacy in information that he willingly reveals to a third party, even if he does so for a limited purpose and assumes that it will be held in confidence. *United States v. McIntyre*, 646 F.3d 1107, 1111 (8th Cir. 2011).  This is known as the "third-party doctrine."  *See also United States v. Miller*, 425 U.S. 435, 443 (1976); *Smith v. Maryland*, 442 U.S. 735, 744 (1979).

Riddick has no reasonable expectation of privacy in "his subscriber information,

including his IP address," because he voluntarily disclosed this information to a third party. *United States v. Wheelock*, 772 F.3d 825, 828 (8th Cir. 2014) (internal quotation omitted). Specifically, he willingly conveyed this information to Chatstep in order to access its website and services. *See Miller*, 425 U.S. at 443. Therefore, Chatstep's business records containing Riddick's non-content subscriber information, including his IP addresses, usernames, the dates and times that he accessed various chatrooms, and the names of those chatrooms, were properly obtained through subpoenas or disclosure orders. *See Wheelock*, 772 F.3d at 828–29.

Riddick, however, argues that suppression is required under *Carpenter v. United States*. 138 S. Ct. at 2206. In *Carpenter*, the Supreme Court held that the third-party doctrine does not apply to cell-site location information ("CSLI"). *Id.* at 2217–18. CSLI is information collected by wireless service providers when an individual cell phone identifies its location to nearby cell towers. *Id.* at 2211–12. Because CSLI contains an incredibly detailed history of an individual's physical movements, possibly going back several years, defendants have a reasonable expectation of privacy in this information. *See id.* at 2217–18. Accordingly, the government is required to get a warrant before obtaining CSLI from a third-party service provider.

Riddick reads *Carpenter* to also apply to non-content information that enables the government to track an individual's movements across the internet. Specifically, he analogizes the government's use of CSLI to track Carpenter's location in the physical world

6

to its use of the information obtained from Chatstep to track Riddick's location in the digital world.   While this is an interesting argument, it is an untenable extension of *Carpenter* because that case is based specifically upon the unique characteristics of CSLI.   Here, the data requested from Chatstep is not, nor is it similar to, CSLI.

First, CSLI is qualitatively different than other types of non-content or location data stored by third-party providers: it is vastly more detailed, more informative, and often contains historical information going back several years.   *See id.* at 2219–20.   Because many people carry their cell phones almost all of the time, CSLI is a "near perfect" surveillance tool.   *Id.* at 2218.   In contrast, the data obtained from Chatstep via subpoena is far more limited—it concerned non-content information about Riddick's activity within one particular website.   Because Riddick has a dynamic IP address that occasionally changes, the evidence at issue likely does not represent all of his activity on that website.   Further, it almost certainly does not come close to capturing all of Riddick's activity on the internet.

Additionally, while one may have a reasonable expectation of privacy in one's *physical* movements, *see United States v. Jones*, 565 U.S. 400, 408 (2012), the subpoenas at issue concern non-content information about one's movements across the *internet*, such as IP addresses and names.   Even after *Carpenter*, at least one court has held that such information is unprotected by the Fourth Amendment.   *See, e.g.*, *United States v. Contreras*, 905 F.3d 853, 857 (5th Cir. 2018); *United States v. Landry*, 729 F. App'x 345, 345–46 (5th Cir. 2018).   In short, rather than being analogous to a "detailed chronicle of a person's

*physical* location compiled every day, every moment, over several years," *Carpenter*, 138 S. Ct. at 2220, this information is more similar to the discrete, unprotected bank records in *Miller* or the pen register data in *Smith*.

Second, CSLI is unique because there is hardly any effort required for a person to transmit this information to a third party—and he often does so unknowingly. *Carpenter*, 138 S. Ct. at 2220. CSLI is automatically and continuously generated after an individual simply turns on his cell phone. *Id.* Thus, the transmission of CSLI is fairly passive, and a person does not share his CSLI with a third party in the same way that he more actively discloses other types of information. *See id.* Unlike CSLI, the data obtained from Chatstep was actively shared by Riddick, similar to the act of placing a call in *Smith*. 442 U.S. at 744. Riddick had to open his computer, log on to the internet, open his browser, access Chatstep's website, log into his account, and create or enter a particular chatroom. In so doing, Riddick intentionally revealed to Chatstep his username, IP address, the chatroom name, and the time and date of entry. *See id.*

For these reasons, *Carpenter* does not apply. The warrantless information obtained from Chatstep did not violate Riddick's Fourth Amendment rights because he had no reasonable expectation of privacy in that information, and it was properly obtained through subpoenas and disclosure orders.

### 2. Information Exceeding the Scope of the Warrant

Riddick's argument that Chatstep exceeded the scope of the search warrant by

providing the LRDP with additional information is unpersuasive because he did not have a reasonable expectation of privacy in that information.   First, the account information regarding IP addresses other than IP address ea05 was produced in response to various LRPD subpoenas and court orders, and not in response to the search warrant.

Second, the warrant itself directed Chatstep to provide records related to "screen/user name: Mom45 Room: Nude Port: 49823 and IP address: [ea05] . . . ."  Chatstep provided this information, but it also disclosed other activity associated with IP address ea05, including that of an individual going by usernames "NudeMom," NudeMom45," and "Missy."  This additional information does appear to exceed the scope of the warrant, which only authorized the search and seizure of records pertaining to username "Mom45" and IP address ea05.  This, however, is of no practical consequence because Riddick did not have a reasonable expectation of privacy in this information.

 Even if this information was protected by the Fourth Amendment, suppression is an inappropriate remedy under the good-faith exception.  *See United States v. Leon*, 468 U.S. 897 (1984).  Nothing in the record suggests that the affidavit in support of the warrant contained a false statement, that the issuing judge abdicated her judicial role when issuing it, that it was unsupported by probable cause, or that it was facially deficient.  *See United States v. Fiorito*, 640 F.3d 338, 345 (8th Cir. 2011).  Rather, Chatstep, perhaps mistakenly, provided investigators with more than what the warrant authorized and what the investigators were actually seeking.

B.     Evidence Obtained From Riddick's Home

*1. Information in Support of the Search Warrant*

The search warrant for Riddick's home was not based on illegally obtained information because, as discussed above, Chatstep properly disclosed this information to the LRPD.   Even if the information was improperly obtained, there was still independent probable cause supporting the search warrant for Riddick's home.  *See United States v. Madrid*, 152 F.3d 1034, 1040 (8th Cir. 1998).

"A search warrant is valid under the Fourth Amendment if it establishes probable cause." *United States v. Carpenter*, 422 F.3d 738, 744 (8th Cir. 2005).  Probable cause exists when there is a "fair probability that contraband or evidence of a crime will be found in a particular place" looking at the totality of the circumstances.  *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *see also United States v. Donnelly*, 475 F.3d 946, 954 (8th Cir. 2007); *United States v. Horn*, 187 F.3d 781, 785 (8th Cir. 1999).  "Great deference" is given to the initial probable cause determination.  *United States v. Colbert*, 605 F.3d 573, 576 (8th Cir. 2010). Courts normally uphold probable cause findings when a judicial officer had a "substantial basis for . . . conclud[ing] that a search would uncover evidence of wrongdoing." *Horn*, 187 F.3d at 785 (internal quotations omitted).

If the information Riddick asserts was illegally obtained from Chatstep is stricken, the affidavit supporting the warrant application is still sufficient to establish probable cause. *See Madrid*, 152 F.3d at 1040.  Specifically, in the affidavit, Kalmer states that a person

using IP address ea05 uploaded an image of suspected child pornography to Chatstep on December 23, 2016.  She further states that, based on information obtained from Comcast, this IP address was assigned to Edgar Riddick.  Kalmer also says that she surveilled Riddick's house and saw two cars registered to Riddick at this address.  Finally, Kalmer, who has extensive experience in investigating child pornography cases, also states that collectors of child pornography typically retain their collections for many years, conceal them in a secure location, and use computers and other electronic data storage devices to do so.  *See also United States v. Chase*, 717 F.3d 651, 653 (8th Cir. 2013) ("The observation that images of child pornography are likely to be hoarded by persons interested in those materials in the privacy of their homes is supported by common sense and the cases.") (quoting *United States v. Hyer*, 498 F. App'x 658, 660–61 (8th Cir. 2013)).

This information is sufficient to create a "fair probability" that evidence of child pornography would be located at Riddick's house.  *See also United States v. Chrobak*, 289 F.3d 1043, 1045–46 (8th Cir. 2002) (holding that there was probable cause to support a search warrant based on a single transmission of fourteen images of suspected child pornography that was traced back to the defendant's home); *United States v. Reibert*, No. 8:13-CR-00107, 2015 WL 366716, at *3 (D. Neb. Jan. 27, 2015).  Thus, the warrant was properly supported, and any evidence obtained from the search  need not be suppressed.

Further, the warrant was not stale simply because it was executed sixty-two days after the suspected child pornography was uploaded to Chatstep on December 23, 2016.  "A

warrant becomes stale if the information supporting it is not sufficiently close in time to the issuance of the warrant and the subsequent search conducted so that probable cause can be said to exist as of the time of the search." *United States v. Estey*, 595 F.3d 836, 840 (8th Cir. 2010) (quotation omitted). The factors are context-specific and "include the lapse of time since the warrant was issued, the nature of the criminal activity, and the kind of property subject to the search." *Id.* (quotation omitted).

In similar cases involving child pornography and electronic data storage, the Eighth Circuit has held that much lengthier periods did not render stale the information relied upon by a warrant. *Id.* ("Given the circumstances of the case and the nature of the crime, the execution of the warrant five months after the development of the information did not render the warrant deficient in any respect based on stale information."); *United States v. Lemon*, 590 F.3d 612, 615 (8th Cir. 2010) (explaining that in cases of child pornography in which the suspected offense is continuing in nature, a period of eighteen months does not render information stale); *see also United States v. Morales-Aldahondo*, 524 F.3d 115, 119 (1st Cir. 2008) (holding that a period of three years did not render information stale). Moreover, Kalmer's affidavit discusses at length that, based on her experiences investigating these cases, child pornography collectors often retain their collections for many years and rarely throw them away.

For these reasons, a court could easily find that there was a "fair probability" that child pornography would be present at Riddick's home even months after December 23, 2016. *See*

*Chrobak*, 289 F.3d at 1046.  Therefore, the information relied upon in obtaining the search warrant was not fatally stale.

### 2. Overbreadth

The search warrant for Riddick's home was not overly broad.  A warrant authorizing a search of all digital devices and their contents for evidence of child pornography was sufficiently particular.

"To satisfy the particularity requirement of the [F]ourth [A]mendment, the warrant must be sufficiently definite to enable the searching officers to identify the property authorized to be seized." *Horn*, 187 F.3d at 788.  "The degree of specificity required will depend on the circumstances of the case and on the type of items involved." *United States v. Summage*, 481 F.3d 1075, 1079 (8th Cir. 2007) (quotation omitted).

First, Riddick argues that the warrant essentially authorized an unlimited and unconstrained search of all of his electronic devices.  He asserts that, under *Riley v. California*, 134 S.Ct. 2473 (2014), a search warrant must identify the particular areas of a computer or other electronic data storage device that are to be searched.  In *Riley*, the Supreme Court observed that cell phones, like computers and other devices with electronic data storage capacity, have the ability to store vast amounts of private information, and their use is ubiquitous in modern life.  134 S.Ct. at 2484–85.  Accordingly, the government needs to obtain a warrant before searching their contents.  *Id.* at 2485.  Riddick asserts that *Riley* prevents the government from rummaging around his computers, hard drives, and other

electronic devices in an unconstrained fashion. *See also In re Search of a Nextel Cellular Tel.*, No. 14–MJ–8005–DJW, 2014 WL 2898262, at *13 (D. Kan. June 26, 2014) ("[P]robable cause to believe drug trafficking communications may be found in a phone's mail application will not support the search of the phone's Angry Birds application.").

This argument is unpersuasive because the facts justify a fairly broad warrant. Here, the search warrant authorize law enforcement to specifically search for evidence of child pornography—it does not permit a free-ranging fishing expedition through Riddick's digital devices. *See United States v. Gleich*, 397 F.3d 608, 611–12 (8th Cir. 2005). And "it is clear that because criminals can—and often do—hide, mislabel, or manipulate files to conceal criminal activity, a broad, expansive search" of Riddick's digital devices was necessary. *United States v. Stabile*, 633 F.3d 219, 237 (3rd Cir. 2011); *see also United States v. Burgess*, 576 F.3d 1078, 1092–94 (10th Cir. 2009) ("[T]here may be no practical substitute for actually looking in many (perhaps all) folders and sometimes at the documents contained within those folders, and that is true whether the search is of computer files or physical files.").

The government, however, does not automatically have free reign to search every file on an electronic device upon obtaining a warrant. *See Stabile*, 633 F.3d at 237. Whether a warrant satisfies the Fourth Amendment's particularity requirement will turn on a context-specific analysis. Based on the testimony presented at the hearing, it appears that evidence of child pornography could be easily concealed in a variety of file formats, in various file

locations and applications, and across different devices. *See United States v. Richards*, 659 F.3d 527, 538 (6th Cir. 2011) ("[A] computer search may be as extensive as reasonably required to locate the items described in the warrant based on probable cause.") (quotation omitted). This justifies an expansive search of Riddick's digital equipment for evidence of child pornography, as investigators did not know, prior to searching, where such evidence could be located. The fact that the warrant did not limit the search to a particular file location, file format, or search strategy does not mean it was overbroad. *See United States v. Cartier*, 543 F.3d 442, 447–48 (8th Cir. 2008).

Although Riddick proposes less intrusive ways of searching a digital device, such as searching by the "hash value" of images or through  key-word searches, these methods have serious flaws. For example, hash values can be manipulated by distorting the size of an image; a search based solely on known hash values will not account for images that have not yet been assigned a known value by NCMEC; and it would be far too burdensome for the government to run a search of the hash value of every known image of child pornography each time it searches a digital device for such evidence. Moreover, there is no evidence in the record suggesting that investigators abused the warrant by looking in areas of the digital devices where they knew evidence of child pornography could not be found. *See id.* at 447.

Second, Riddick's argument that the warrant improperly authorized law enforcement to seize his computer and other digital storage devices outright, or to create and search electronic copies of them through digital imaging, is unpersuasive. Courts routinely allow

seized electronic equipment or data to be searched offsite, *see United States v. Hill*, 459 F.3d 966, 974–75 (9th Cir. 2006); *United States v. Upham*, 168 F.3d 532, 535 (1st Cir. 1999), because it is frequently difficult and more intrusive to an individual's privacy, to perform an on-site review of those items. *Summage*, 481 F.3d at 1079. Investigators will typically take, for example, a seized digital device and "image" it, which entails creating a bit-by-bit copy of the computer's hard disk for offsite inspection.

For the reasons discussed above, it was reasonable for the warrant to permit such imaging and/or offsite inspection in addition to the fairly expansive search of the devices. Again, this is true in light of the fact that the warrant authorized law enforcement to search only for evidence of child pornography and that it was not known where such evidence could be located on Riddick's digital devices.

### C.   Evidence Obtained from Riddick's Car and Statements to Investigators

#### 1. Encounter with Detective Koonce

Riddick asserts that the evidence obtained from his vehicle and statements to investigators should be suppressed because they stemmed from an illegal traffic stop. This is unpersuasive because Riddick was not illegally detained at the time that he consented to the search of his car and when he gave his statements to investigators. Even if Riddick was illegally stopped, suppression would still be inappropriate under the attenuation doctrine.

A person is "seized" by government agents under the Fourth Amendment when he reasonably believes he is not free to leave. *United States v. Jones*, 269 F.3d 919, 925 (8th

Cir. 2001).  "A seizure does not occur simply because a law enforcement officer approaches an individual and asks a few questions or requests permission to search an area." *United States v. Flores*, 474 F.3d 1100, 1103 (8th Cir. 2007) (quotation omitted).  Circumstances indicating a seizure include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled."  *Id.* (quotation omitted).

Police may detain occupants of a home who are inside, or immediately outside, the home when a search warrant is being executed. *Michigan v. Summers*, 452 U.S. 692, 704–06 (1981); *Bailey v. United States*, 568 U.S. 186, 202 (2013).  Here, it is undisputed that Riddick was not detained incident to the search of his house because he was first encountered by the LRPD at a hotel twelve to fifteen miles away.  There was also no warrant for Riddick's arrest, and Koonce testified that he had no reasonable suspicion that Riddick was carrying a weapon or was otherwise dangerous.  Rather, Koonce approached Riddick at the hotel simply to tell him that the search warrant was being executed and to ask whether Riddick would come back to the house.  The government asserts that the *entire* encounter between Koonce and Riddick was consensual and that Riddick permitted Koonce to search his vehicle and willingly accompanied Koonce and Carlton back to the house.

The government's argument is somewhat unpersuasive. While the encounter quickly became consensual, it did not start out that way.  Instead, Koonce's initial approach looks

17

identical to a *Terry* or traffic stop.  *See Terry v. Ohio*, 392 U.S. 1, 30 (1968); *see also Pennsylvania v. Mimms*, 434 U.S. 106 (1977).  Koonce walked up to Riddick's car while it was stopped at the entrance of the hotel.  When Riddick saw Koonce, who was wearing a tactical vest identifying him as a police officer, approaching his car, Riddick rolled down his window.  Koonce immediately asked Riddick to step out of the car, placed Riddick towards the rear of the car, patted him down, and asked him to wait there while he frisked Riddick's passenger and asked him a few questions.  Koonce then explained the purpose of the stop to Riddick.  All of this happened fairly quickly, and a reasonable person in Riddick's position would not have felt free to leave.  Consequently, Riddick was "seized."  *Jones*, 269 F.3d at 924.  This encounter was, at the very beginning, an illegal detention because there was no reasonable suspicion supporting the stop.  *See id.*

The stop, however, quickly transformed into a consensual encounter.  Koonce credibly testified that he told Riddick multiple times thereafter that Riddick was free to leave and was not under arrest.  Riddick was never handcuffed.  Riddick was not compelled to return to the house with Koonce and Carlton.  Riddick rode home in the police car voluntarily after allowing his associate to take his car.  Also, Koonce never drew his weapon or used language or a tone that indicated that compliance was required, and there was only one other officer present at the scene.

Therefore, after the initial frisk and explanation for the stop, Riddick was no longer detained, because a reasonable person would have understood that he was free to leave.  *See*

*id.* at 925.  Thus, his consent and later statements to investigators were not the products of an illegal detention.

Further, it appears that his statements to police were voluntarily given.  *See United States v. Saenz*, 474 F.3d 1132, 1136–37 (8th Cir. 2007) (citations omitted).  This is true because Riddick was not in custody when he gave his statements, he is a well-educated engineer in his mid-fifties, the encounter was non-threatening, and Riddick executed a second, written consent after returning home.  *See United States v. Johnson*, 619 F.3d 910, 918 (8th Cir. 2010) (listing factors to be considered when determining if consent was voluntary).

Even if the entire stop was illegal, suppression of this evidence would be inappropriate under the attenuation doctrine, which permits the introduction of evidence when there is only a remote connection between the evidence at issue and the unlawful police conduct.  *See United States v. Dickson*, 64 F.3d 409, 410–11 (8th Cir. 1995).  Again, Riddick freely consented to the search of his vehicle.  *See id.* (noting that voluntary consent may purge the taint of an illegal action); *United States v. Ramos*, 42 F.3d 1160, 1163–64 (8th Cir. 1994).  Although Riddick's consent was initially given during the stop, which tends to weigh against attenuation, the circumstances indicate that it was nonetheless voluntary and not a result of police coercion.  *United States v. Esquivel*, 507 F.3d 1154, 1160 (8th Cir. 2007); *United States v. Palacios-Suarez*, 149 F.3d 770, 772 (8th Cir. 1998).

Riddick also executed a written consent to search the items located in the car after he

returned home, which would have occurred approximately fifteen to twenty minutes later. Consequently, the length of time between the stop and the second consent further negates any causal connection between the two events. *See also United States v. Whisenton*, 765 F.3d 938, 941–42 (8th Cir. 2014) ("Under our precedent, fifteen minutes is sufficient to demonstrate an attenuation of the illegality.") (citations omitted); *United States v. Herrera-Gonzalez*, 474 F.3d 1105, 1112 (8th Cir. 2007).

Similarly, Riddick's statements to investigators were sufficiently attenuated from the stop based on their temporal proximity, the intervening circumstances, and the presence of a *Miranda* warning. *Whisenton*, 765 F.3d at 942; *United States v. Reisselman*, 646 F.3d 1072, 1081 (8th Cir. 2011). Again, Riddick voluntarily returned home after the stop. Upon returning home, he was again advised that he was not under arrest. He then gave written consent to search the items found in his vehicle. It also appears that most of Riddick's statements to investigators were made after he was given a *Miranda* warning. *See United States v. Yorgensen*, 845 F.3d 908, 914 (8th Cir. 2017). These circumstances suggest a lack of a causal connection between the stop and his decision to speak to officers.

Finally, there is no indication that Riddick was stopped in bad faith or that there was any flagrant misconduct—investigators simply wanted to alert Riddick about the warrant, and it does not appear that Koonce or Kalmer were attempting to exploit an illegal situation. *See id.*

*2. Voluntariness of Statements*

Riddick's argument that his statements to investigators were made involuntarily is unpersuasive because he was not in custody when he made them and he freely waived his Fifth Amendment rights.   Further, any statements made to investigators before or after a *Miranda* warning need not be suppressed because, again, Riddick was never in custody when he made them.

A person is in custody if he has been arrested or, under the totality of the circumstances, been deprived of his freedom of action in any significant way.  *See United States v. Sanchez*, 676 F.3d 627, 630 (8th Cir. 2012) (citing *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990)).  Courts in the Eighth Circuit use a nonexclusive, six-factor test to make this determination: (1) whether the suspect was informed he was not under arrest at the time in question and was free to leave; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with the police or voluntarily agreed to answer questions; (4) whether the suspect was subjected to strong arm tactics or deception during questioning; (5) whether the atmosphere of the questioning was police dominated; (6) whether the suspect was arrested at the end of the questioning.  *Id.*

The facts strongly suggest that Riddick was not deprived of his freedom in any significant way when he spoke with investigators.  Kalmer credibly testified that Riddick was informed several times that he was not under arrest and was free to leave, which is

corroborated by the police transcript of his statements.  *Griffin*, 922 F.2d at 1349  ("The most obvious and effective means of demonstrating that a suspect has not been taken into custody . . . is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will.") (internal quotation omitted).  The transcript indicates that Riddick simply wanted to stay for his family.

Additionally, Riddick was never handcuffed nor told that he could not leave.  Riddick got up and left several times to go to the restroom and to fix a broken window.  Although he was accompanied by an officer during these breaks, this was not unreasonable, as the house was still being searched and the police were concerned about safety.  *C.f. United States v. Axsom*, 289 F.3d 496, 501–02 (8th Cir. 2002).  Riddick was neither threatened nor subjected to hostile police tactics, and the detectives used a conversational tone.  Finally, Riddick made most, if not all, of his statements while seated at his kitchen table.  *See United States v. Czichray*, 378 F.3d 822, 826–27 (8th Cir. 2004) ("When a person is questioned on his own turf, we have observed repeatedly that the surroundings are not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation.") (internal quotations omitted).

All of this indicates that the interrogation was noncustodial and that Riddick was not required to receive a *Miranda* warning.  *See Sanchez*, 676 F.3d at 630.  For this reason, any pre-*Miranda* statements need not be suppressed.

Riddick also argues that post-*Miranda* statements should be suppressed because the

*Miranda* warning was given "mid-stream," and not before the interrogation.  *See Missouri v. Seibert*, 542 U.S. 600 (2004).  This argument is unpersuasive because a *Miranda* warning is required only when an interrogation is custodial.  *See United States v. Ollie*, 442 F.3d 1135, 1140–41 (8th Cir. 2006).

Further, Riddick's post-*Miranda* statements were made voluntarily.  "An individual's waiver of the Fifth Amendment privilege against self-incrimination . . . is valid if made voluntarily, knowingly and intelligently."  *United States v. Crisolis-Gonzalez*, 742 F.3d 830, 838 (8th Cir. 2014) (quoting *United States v. Harper*, 466 F.3d 634, 643 (8th Cir. 2006)).  Again, Riddick was not in custody, and it appears he was given a *Miranda* warning merely as a precaution.  As set forth above, he is well-educated, in his mid-fifties, was not subjected to any unlawful actions, was repeatedly told that he was free to leave, and was told that he had a right to speak with a lawyer.  Finally, nothing indicates Riddick's waiver was involuntary for the purposes of the Due Process Clause.  *See United States v. LeBrun*, 363 F.3d 715, 724 (8th Cir. 2004) ("A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination.").

## III.  CONCLUSION

For these reasons, Riddick's motions to suppress [Doc. No. 23, 24, 25, 26, 27] are denied.

IT IS SO ORDERED this 28th day of December 2018.

_____
UNITED STATES DISTRICT JUDGE